IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| KATHLEEN A. COX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-3075 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

This is an action under 42 U.S.C. § 405(g) for judicial review of the Administrative Law Judge (ALJ)'s Decision denying Plaintiff Kathleen A. Cox's application for Social Security Disability benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1383(c)(3). Before the Court are the Plaintiff's Motion for Summary Judgment (Doc. 14) and the Defendant's Motion for Summary Affirmance (Doc. 18). For the reasons that follow, Plaintiff's Motion for Summary Judgment is GRANTED and Defendant's Motion for Summary Affirmance is DENIED.

## I.    BACKGROUND

Plaintiff filed an application for disability insurance benefits and supplemental security income on September 26, 2018, alleging disability beginning March 23, 2016. (R. 19). Plaintiff was 44 years old on her alleged onset date of March 23, 2016. (R. 31). She never obtained a GED but completed tenth grade in school. (R. 48). She reported that she

stopped working due to anxiety, dizziness, and headaches. (R. 49). Due to her anxiety, she needed someone to be with her in public and she was particularly anxious around people in positions of authority. (R. 64). She said she had headaches lasting between ten minutes and "most of the day" two to three times a week, and she reported that she usually had to lie down in a silent, dark room for a few hours to get over the headache. (R. 66-67).

In March 2016, Plaintiff sought medical treatment for dizziness, visual blurring, and body tingling. (R. 364). In May 2016, she was evaluated by a neurologist for lightheadedness, disorientation, and headaches and prescribed a medication that lessened the intensity of her headaches. (R. 387, 499-500). Her EEG results were normal. (R. 496). By February 2017, her doctor noted that her history was compatible with migraines and noted that she walked "very slowly and insecurely." (R. 493-94). At that visit, her doctor requested an EEG and noted that her MRI and vestibular assessment were normal. (R. 492-93). That EEG again revealed normal results. (R. 475). Ultimately, she was diagnosed with episodic lightheadedness, "nonintractable migraine," and "unspecified migraine type." (R. 471, 493). Further, she reported that her daytime fatigue coincided with dizzy spells, headaches, and pain, and as a result, she has had trouble sleeping. (R. 455).

In September 2017, Plaintiff began treatment for back pain and her physician noted multilevel disc degeneration. (R. 460; 454). On September 12, 2018, Plaintiff's rheumatology specialist noted that Plaintiff's "symptoms seem likely consistent with fibromyalgia." (R. 829). She continued to see a number of specialists in 2018 and 2019 for

her back pain. (R. 400, 912, 694, 699, 704, 713, 727-28, 737, 882, 888). Her cervical spine treatments also revealed multilevel degenerative disc disease and spondylosis. (R. 995).

Even after surgery, Plaintiff required the use of a walker. (R. 1201). In May 2019, she began reporting worsening memory loss, headaches, and dizziness. (R. 866). Her nurse practitioner noted Plaintiff's forgetfulness was "most likely related to her bedtime medications and fibromyalgia." (R. 869-70). In October 2019, Plaintiff's nurse practitioner stated Plaintiff was experiencing pain throughout her body. (R. 1324). After October 2019, there were no medical records provided. (Doc. 15, Pl. Mot. Summ. J. Mem., at 11).

Plaintiff's claim was initially denied on April 26, 2019, and upon reconsideration on December 30, 2019. (R. 19). At both levels, the State Agency physicians found severe impairments of: disorders of the back-discogenic and degenerative, major joints dysfunction, and migraines. (R. 88; 124). The physicians also determined the non-severe impairments of anxiety and depressive, bipolar, and related disorders. (R. 88). The physicians recommended an RFC limiting Plaintiff to sedentary work and postural limitations based on her history of vertigo episodes. (R. 91).

On September 29, 2020, the ALJ conducted a hearing, during which both Plaintiff and a vocational expert (VE) testified. (R. 19). During the hearing, the ALJ asked counsel for evidence supporting the fibromyalgia diagnosis but did not want "to hear it in the diagnosis list." (R. 68). Counsel began noting indications of pain, and the ALJ noted that pain itself does not necessarily support a finding that there is chronic pain. (R. 69-70). The ALJ discounted any reports of pain, stating, "And quite frankly, I'm a cold-hearted, no-good bum and I don't care. I can report pain all my life and it doesn't mean anything. I

need it to meet the specific requirements of Social Security Ruling 03-2P. That's what I'm asking for." (R. 71). He went on to say, "I don't care about [medical providers] either. I've seen too many medical provider[s] just repeat what they've heard." (R. 71). Instead, the ALJ requested that Plaintiff's counsel present the fibromyalgia diagnosis according to the legal requirements. (R. 71). Later, when Plaintiff's counsel again referenced the medical providers' assessments, the ALJ said, "Counsel, I'm done arguing with you. I've been telling you what I . . . need on a legal basis and you're being a bit obstreperous about it. Because the doctor said so. That's the end of it. And I'm just a grouchy old guy and I don't care if the doctor said it. I need the facts behind why the doctor said it." (R. 73).

Ultimately, the ALJ concluded that Plaintiff met the insured status requirements and had not engaged in gainful activity since the onset date. (R. 21-22). The ALJ found Plaintiff has the severe impairments of disorders of the lumbar and cervical spine and obesity. (R. 22). The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 25). The ALJ found that Plaintiff has the residual functional capacity (RFC) to:

> perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she is limited to occasional climbing of ramps, stairs and ladders; Limited to no climbing of ropes and scaffolds; Limited to occasional stooping, kneeling, crouching and crawling; Limited to jobs that only require up to detailed but uninvolved tasks with few concrete variables, little in the way of change in job process from day to day, and jobs with multistep, self-evident tasks, easily resumed after momentary distraction; Limited to jobs that do not require any work-related interaction with the public, and no more than occasional work-related interaction with co-workers and supervisors.

(R. 26). The ALJ rejected the State Agency physicians' recommendations of sedentary work and postural limitations after concluding the recommendations were not supported by substantial evidence. (R. 30).

## II.    DISCUSSION

### A. Legal Standard

To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairment; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience. See 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000) (internal citation omitted).

Plaintiff has the burden of proving she is disabled. 20 C.F.R. § 404.1512(a)). For these purposes, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act specifies that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The court reviews a decision

denying benefits to determine only whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's decision. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011).

"Substantial evidence" is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Although the task of a court is not to reweigh evidence or substitute its judgment for that of the ALJ, the ALJ's decision "must provide enough discussion for [the Court] to afford [the Plaintiff] meaningful judicial review and assess the validity of the agency's ultimate conclusion." *Yurt*, 758 F.3d at 856-57. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sevec v. Kijakazi*, 59 F.4th 293, 297 (7th Cir. 2023) (internal quotations omitted).

**B. Analysis**

Plaintiff appealed the decision of the ALJ and argued in her Motion for Summary Judgment that the ALJ committed reversible error by: (1) relying on his own opinion instead of the opinion of medical experts; (2) performing only a perfunctory evaluation with regard to Plaintiff's spinal disorder; (3) misapplying the agency's regulations in denying all severe impairments except spinal changes and obesity; and (4) failing to apply the borderline age rule. (Doc. 15 at 14-26).

Defendant argued in the Motion for Summary Affirmance that the ALJ's step two analysis was proper because diagnoses are not dispositive of the question of disability. (Doc. 18 at 7). Further, Defendant argues that the ALJ's analysis at step three was proper because Plaintiff failed to prove that she satisfied any of the criteria of an entry in the Listing of Impairments. (*Id.* at 10). Finally, Defendant argues that the ALJ properly evaluated Plaintiff's subjective symptoms and that substantial evidence supported the ALJ's RFC finding. (*Id.* at 12-20).

### 1. State Agency Physicians

Plaintiff first argues that the ALJ committed reversible error by failing to adequately support his dismissal of the opinions of the State Agency physicians. (Doc. 15 at 14). Defendant argues in response that substantial evidence supported the ALJ's RFC finding. (Doc. 18 at 12-20).

20 C.F.R. § 416.920c(a) provides that an ALJ "will not defer or give any specific evidentiary weight ... to any medical opinion(s) ... including those from [a claimant's] medical sources." He "is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians." *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (refuting the claimant's argument that "the ALJ erred by failing to adopt her [RFC] as determined by any of her physicians"). However, he must "articulate how [he] considered the medical opinions ... in [a claimant's] claim" according to certain criteria. 20 C.F.R. § 416.920c(a).

Specifically, the ALJ was required to evaluate the persuasiveness of each medical opinion based on certain factors: (1) supportability; (2) consistency; (3) the medical

source's relationship with the claimant; (4) specialization; and (5) other factors, including the source's familiarity with other evidence in the claim or an understanding of Social Security disability policies and requirements.  20 C.F.R. § 404.1520c(c)(1)-(5)). An ALJ must explain how he considered the first two factors (supportability and consistency) and may, but is not required to, explain his consideration of the other factors after articulating how he considered medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c(b)(2).

Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the ALJ's opinion.  20 C.F.R. § 404.1520c(c)(1)). Consistency assesses how a medical opinion squares with other evidence, both medical and non-medical, in the record. 20 C.F.R. § 404.1520c(c)(2)). As part of this process, "'[a]n ALJ has the obligation to consider all relevant medical evidence' and not to selectively cite only the evidence that supports his conclusion." *Bakke v. Kijakazi*, 62 F.4th 1061, 1067 (7th Cir. 2023), *quoting Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (per curiam).

An ALJ "need not credit the opinions of the agency's own doctors, but rejecting the opinion of an agency's doctor that supports a disability finding is 'unusual' and 'can be expected to cause a reviewing court to take notice and await a good explanation.'" *Jones v. Saul*, 823 Fed. App'x 434, 439 (7th Cir. 2020), *quoting Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). The Seventh Circuit has recognized that the agency's doctors are "unlikely ... to exaggerate an applicant's disability." *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013).

For instance, in *Paul v. Berryhill*, 760 Fed. App'x 460, 464 (7th Cir. 2019), the Seventh Circuit held that it was an error for the ALJ to discount the opinion of the agency's psychologist. In that case, the ALJ concluded that the agency's psychologist's opinion was not sufficiently specific. *Paul*, 760 Fed. App'x at 464. However, the ALJ did not support that conclusion with evidence. *Id.* In rejecting the ALJ's conclusion, the Seventh Circuit cited to several observations made by the agency psychologist regarding the plaintiff's symptoms that supported his opinion. *Id.* Further, the Seventh Circuit instructed that "if the ALJ believed that Dr. Powell's opinion was deficient, the ALJ should have sought additional clarification from Dr. Powell before discounting it outright." *Id., citing* 20 C.F.R. § 416.919p; *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).

Here, at both the initial and reconsideration levels, the State Agency physicians limited Plaintiff to sedentary work. (R. 91-96, 125-31). The physicians offered a lengthy explanation of Plaintiff's medical history to justify that limitation. (R. 88-96, 122-31). The ALJ rejected these opinions, stating:

> Physically, the state agency concluded the claimant should be limited to sedentary work with occasional climbing ramps and stairs, and no concentrated exposure to vibration. The undersigned does not find this assessment to be persuasive. The state agency states this is due to "back conditions;" however, the state agency then cites to numerous normal physical exam findings including normal range of motion, 5/5 strength, normal gait and normal coordination. The notations of use of a walker and weakness in the leg were noted to be very shortly after the claimant's lumbar surgery and did not continue for at least 12 months as more fully disused above. These objective findings of normal strength and a normal gait are not consistent with a limitation to sedentary work. Further, the state agency does not adequately explain the need for a limitation with respect to vibration, and their assessment of limitation with exposure to hazards was due to reports of vertigo and dizziness, which the undersigned has

found to be non-severe as discussed above. These limitations are not warranted based on the record.

(R. 30) (internal citations omitted).

The ALJ's rejection of the State Agency physicians' assessment does not address the objective medical evidence relied upon by the State Agency physicians. It is true that some of the citations do include normal results. (R. 92-96). But looking at the State Agency physician's assessment as a whole makes it clear that the objective findings became increasingly abnormal over time. (*Id.*). The evidence cited to by the State Agency physicians includes: dizziness, hemiparesthesia, decreased range of motion, tenderness, very slowed gaits, disc bulges, disc prolapse, decreased sensations to pinpricks, a positive Hoffman sign, abnormal EKGs, abnormal spinal MRIs, chronic widespread pain. (*Id.*).

By failing to discuss the totality of the objective medical evidence, the ALJ did not provide a valid explanation for rejecting the State Agency physicians' opinions. *See Beardsley*, 758 F.3d at 839. Just as in *Paul*, the agency physicians here provided a detailed account of the evidence in this case, which did support their conclusions. (R. 92-96, 125-31). The ALJ only discussed a portion of those observations but did not address the portions that were inconsistent with the ALJ's conclusion. (*Id.*). Thus, the ALJ's rejection of the agency physicians' opinions was not supported by the evidence. Moreover, the ALJ did not seek additional clarification from the agency physicians before discounting their opinions, which was also an error. *See Paul*, 760 Fed. App'x at 464. Therefore, the ALJ erred in failing to provide a sufficient basis to discount the State Agency physicians' opinions.

## 2.  Presumptive Disability Analysis

Plaintiff next argues that the ALJ erred when evaluating Plaintiff's spinal disorders by failing to adequately consider the requirements in Listing 1.04(A). (Doc. 15 at 24-25). Commissioner argues that the ALJ understood that the listing level criteria must persist for a continuous period of at least twelve months. (Doc. 18-1 at 10-11).

> Listing 1.04 reads, in relevant part:
>
> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With: *** Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, Part A, Listing § 1.04. A finding of disability at step three requires that a claimant establish that she has an impairment that has satisfied, or can be expected to satisfy, a listing's criteria for at least twelve months. 20 C.F.R. § 404.1520(a)(4)(iii).

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). Where the decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The ALJ need not discuss every piece of evidence, but he must evaluate evidence supporting the claimant's position to give the reviewing court confidence that he engaged

in a thorough consideration of the record. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). The ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Banhart*, 374 F.3d 470, 474 (7th Cir. 2004).

For instance, in *Minnick*, the ALJ stated that the plaintiff's degenerative disc disease did not meet or equal listing 1.04 since "[t]he evidence does not establish the presence of nerve root compression, spinal arachnoiditis, or spinal stenosis resulting in pseudoclaudication, as required by that listing." *Minnick*, 775 F.3d at 935. The Seventh Circuit reversed the ALJ's decision because the ALJ failed to recognize facts that could show that the claimant met or equaled the listing. *Id.* at 936. Instead, the ALJ dismissed that possibility in two sentences. *Id.* Because of the short analysis, the Seventh Circuit could not "discern from the ALJ's scant analysis whether she considered and dismissed, or completely failed to consider, this pertinent evidence. If the ALJ did consider and dismiss some or all of this evidence, she never so stated." *Id.*

In considering whether Plaintiff met the listing requirements for Listing 1.04, the ALJ wrote:

> The claimant's spinal disorders do not meet or equal Listing 1.04. The medical evidence of record does not document any spinal abnormalities necessary to meet the requirements of Section 1.04, governing disorders of the spine. There is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight-leg raising test; spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication with inability to ambulate effectively, as required by section 1.04. Further, there is no evidence of inability to ambulate effectively as defined in section 1.00B(2)(b) and required by section 1.02A or involvement of one major peripheral joint in each upper extremity resulting in inability to perform fine and gross movements effectively as defined in section 1.00B(2)(c) and required by section 1.02B. The claimant has been

noted to be able to walk without the use of any assistive devices and to have normal grip strength. Imaging studies did not show the required nerve root compression or spinal arachnoiditis.

(R. 25-26) (internal citations omitted).

The ALJ's findings are inconsistent with the medical records containing evidence of imaging which demonstrates nerve root compression. (R. 995). Additionally, neuro-anatomic distribution of pain with tenderness to palpation in the hips and lower back were noted in a number of reports throughout the record. (R. 402-03, 416, 426, 454, 701, 829, 883, 972). The record also contains exam findings of limitation of motion of the lumbar spine (R. 402-03, 416, 426, 454, 701), muscle weakness (R. 402-03, 701, 1070), sensory and reflex loss (R. 695, 701), and positive straight-leg-raising tests (R. 402-03, 701, 883, 972).

Just as in *Minnick*, there is no evidence that the ALJ considered the pertinent evidence contained in Plaintiff's medical records. The ALJ did not properly identify the facts that demonstrated Plaintiff met the requirements of Listing 1.04. Without additional explanation as to the evidence considered, this Court cannot determine the ALJ's line of reasoning and whether he properly considered and dismissed the relevant evidence. Even if it could, reviewing courts cannot build the logical bridge on behalf of the ALJ. *Minnick*, 775 F.3d at 935.

Although the Commissioner argues that the ALJ based his decision on the twelve-month durational period, the ALJ did not include that in his analysis. (R. 25-26). Under the *Chenery* doctrine, this Court must confine its review to the grounds on which the ALJ made his findings. *See, e.g., Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) ("Our review is

limited also to the ALJ's rationales; we do not uphold an ALJ's decision by giving it different grounds to stand upon."); *Meuser v. Convin*, 838 F.3d 905, 911 (7th Cir. 2016) (finding that where "the ALJ did not rely on this rationale in his opinion,... the Commissioner cannot now rely on it"). Therefore, this Court will not consider that argument.

### 3. Severe Impairments Analysis

Plaintiff's arguments in this case also center around the ALJ's findings on Plaintiff's severe impairments of: disorders of the lumbar and cervical spine and obesity. (R. 22). The ALJ noted that the state agency found the dysfunction-major joints to be a severe impairment, but the ALJ did not include that impairment due to the lack of information from the physician regarding which joint was impaired. (R. 22). With respect to Plaintiff's headaches or migraines, the ALJ declined to categorize the headaches as an impairment because he found "the record does not establish the appropriate clinical signs to warrant a diagnosis of a primary headache disorder; thus, this is not a medically determinable impairment." (R. 22). The ALJ further noted that Plaintiff's renal stones were successfully treated, so those would not be considered as impairments. (R. 23). As for the fibromyalgia, the ALJ found that it was not a medically determinable impairment because other potential causes were not ruled out by a neuromuscular specialist. (R. 23).

The second step of the ALJ's analysis focuses on whether an alleged physical or mental impairment is "severe, medically determinable, and meets a durational requirement." *Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011). In making its conclusions at each step, the ALJ does not need to consider every piece of evidence; rather

he "must build a logical bridge from the evidence to his conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted). That said, the ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto*, 374 F.3d at 474; *see also Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014) (holding the ALJ may not cherry pick facts supporting her finding of disability).

An ALJ must not substitute her own judgment for a physician's opinion without relying on other medical evidence or authority in the record. *See Clifford v. Apfel*, 227 F.3d 863 at 870 (7th Cir. 2000.) "[J]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor." *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990). The Seventh Circuit stated: "The cases in which we have reversed because an ALJ impermissibly 'played doctor' are ones in which the ALJ failed to address relevant evidence." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).

The court generally does not order remand at step two if the ALJ failed to find an impairment "severe" so long as the ALJ has found at least one severe impairment and proceeded to assess the claimant's RFC. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). The Seventh Circuit has "frequently reminded the agency that an ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *see also Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("In determining an individual's RFC, the ALJ must evaluate all limitations that arise from medically determinable

impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling."). A failure to fully consider the impact of even non-severe impairments requires reversal. *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003).

### a.  Major Joint Dysfunction

Listing 1.02 defines dysfunction of a joint:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With: A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b; or B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.

In *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012), the plaintiff argued that the ALJ failed to take into account several of her severe impairments. Although the Seventh Circuit noted that any omission about the impairments at step two was harmless because the case advanced to step three, it did hold that the omissions warranted reversal because the RFC was flawed as a result of the ALJ's failure to consider those impairments. *Arnett*, 676 F.3d at 591-94. The ALJ's failure to incorporate several impairments into the RFC meant that the ALJ failed to formulate an RFC that is sufficiently specific to the petitioner. *Id.* at 593.

Here, the ALJ noted that the state agency found the dysfunction-major joints to be a severe impairment, but the ALJ did not include that impairment due to the lack of

information from the physician regarding which joint was impaired. (R. 22). The ALJ

specifically stated:

> The undersigned notes that the state agency found the dysfunction-major
> joints to be a severe impairment; however, the state agency did not discuss
> which joint is allegedly dysfunctional. The undersigned could find no
> imaging studies corroborating any arthritis, joint space narrowing, or
> abnormalities in any of the claimant's joints. CT scan of the pelvis showed
> the SI joints were intact and no significant degenerative changes in the hips.
> The claimant has not sought treatment for any pain or limitation in any of
> her joints such as her knees, hips, shoulders, etc. This is not a medically
> determinable impairment.

(R. 22) (internal citations omitted).

However, there is considerable evidence in the record to suggest that Plaintiff

experiences ankle pain and limitation of motion, which is one of the weight-bearing joints

specifically mentioned in Listing 1.02. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02. The

Disability Determination Explanation report referenced Plaintiff experiencing the

following:

> slow gait on May 4, 2016; reduced range of motion, and a slowed and
> antalgic gait on April 18, 2018; decreased range of motion and tenderness
> on May 21, 2018;  limited range of motion, positive straight leg raise,
> difficulty rising from a seated position, reduced strength, absent right ankle
> reflex, and a slowed and antalgic gait on October 14, 2018; decreased
> pinprick sensation in the left lower extremity, a positive Hoffman's sign
> bilaterally with complaints of neck pain elicited after specific questioning
> on December 18, 2018; and decreased sensation to pinprick in the distal left
> lower extremity, some hyperreflexia Hoffmann sign positive bilaterally,
> and pain in the left upper extremity on January 28, 2019.

(R. 92-96). At the reconsideration level, the determinations were affirmed, and it was

noted that Plaintiff continued to have leg pain and required a walker. (R. 124; 143).

Based on this information, the ALJ's determination that the joint could not be identified was erroneous. The repeated references in the record to ankle pain and stiffness, the necessity of using a walker and slowed gait, and the decreased range of motion all indicate that the requirements of Section 1.02 were met and that Plaintiff's Major Dysfunction of a Joint—namely, the ankle—should have been considered as an impairment. However, there is no evidence that the ALJ properly considered that evidence.

Just as in *Arnett*, this omission had an impact of the ALJ's RFC determination. Although the ALJ made reference to Plaintiff's use of a cane, the ALJ did not find that evidence significant based on the references to Plaintiff's ability to ambulate normally at times. (R. 29). Beyond that, the ALJ did not discuss the other evidence regarding Plaintiff's ankle pain when crafting the RFC. The ALJ failed to sufficiently formulate an RFC that is specific to Plaintiff's needs. Without additional explanation as to the evidence considered, this Court cannot determine the ALJ's line of reasoning here and, even if it could, reviewing courts cannot build the logical bridge on behalf of the ALJ. *See Arnett*, 676 F.3d at 592; *Minnick*, 775 F.3d at 935. Accordingly, the ALJ's determination that it would not include that impairment due to the lack of information from the physician regarding which joint was impaired is not supported by substantial evidence. (R. 22).

### b.  Headache Disorder

To meet a listing, a claimant must establish with objective medical evidence the precise criteria that is specified. *See* 20 C.F.R. § 404.1525; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990). SSR 19-4 sets out the relevant criteria for evaluation and determination of

a primary headache disorder which includes a combination of the following: a primary diagnosis from an AMS, made only "after excluding alternative medical and psychiatric causes of the person's symptoms;" an observation of a typical headache event documented by an AMS; findings on laboratory tests; and a response to treatment. SSR 19-4P. This section encompasses chronic headache illnesses, including migraines, tension headaches, and other "complex neurological disorders involving recurring pain in the head, scalp, or neck." *Id.*

SSR 19-4P states that to rule out other medical conditions with similar symptoms, laboratory tests may be used. *Id.* However, the guidelines make clear that normal results tend to be more consistent with a primary headache disorder than abnormal results. *Id.* "For example, physicians may use magnetic resonance imaging (MRI) to rule out other possible causes of headaches—such as a tumor—meaning that an unremarkable MRI is consistent with a primary headache disorder diagnosis." *Id.* In assessing the severity of a primary headache disorder, the ALJ is directed to consider the following factors:

> A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.*

Courts have reversed the ALJ's decision where the ALJ did not adequately discuss the relevant factors listed in SSR 19-4P. *See Amy O. v. Kijakazi*, 2022 WL 16696266, at *3 (N.D. Ill. Nov. 3, 2022). For instance, in *Amy O.*, the district court reversed the ALJ's decision because although the ALJ cited to SSR 19-4P, the ALJ "did not adequately discuss all the relevant factors." *Amy O.*, 2022 WL 16696266, at *3. In that case, the ALJ only noted the frequency of the plaintiff's migraines but did not discuss the other criteria listed in SSR 19-4P. *Id.* The district court concluded that "The ALJ's Step Three evaluation is conclusory in the most literal sense; most of the sentences are conclusions that Plaintiff does not meeting listing level severity, but there is very little in the way of specific evidence supporting those conclusions or an explanation of the relevant listings' required criteria." *Id.* Because the ALJ failed to adequately perform the duties required by SSR 19-4P, the district court concluded that the ALJ's Step Three analysis was "critically flawed and requires remand." *Id.*

In March 2016, Plaintiff sought treatment for dizziness, visual blurring, and body tingling. (R. 364). In May 2016, a neurologist examined her for lightheadedness, disorientation, and headaches. (R. 387). During the hearing, she reported that she has headaches at least two or three times a week, lasting between ten minutes and a full day. (R. 66). Being in a dark, silent area helps to make her headaches less intense and shorter. (R. 66-67). She was prescribed a medication that lessened the intensity of her headaches. (R. 499-500). Her EEG results were normal. (R. 496). By February 2017, her doctor noted that her history was compatible with migraines and noted that she walked "very slowly and insecurely." (R. 493-94). At that visit, her doctor requested an EEG and noted that her

MRI and vestibular assessment were normal. (R. 492-93). Ultimately, she was diagnosed with episodic lightheadedness, "nonintractable migraine, and "unspecified migraine type." (R. 471, 493).

The ALJ began his analysis by stating,

[A] claimant cannot establish the existence of any medically determinable impairment based solely on a diagnosis in the evidence or on a claimant's reported symptoms. There must be clinical signs or laboratory findings to support the finding. Pursuant to SSR 19-4P, a diagnosis of a primary headache disorder requires a detailed description from a physician of a typical headache event as well as an observation of typical headache event, that includes a description of all associated phenomena, e.g., premonitory symptoms, aura, duration, intensity, accompanying symptoms, and effects of treatment. The diagnosis should be made only after the claimant's history and neurological and any other appropriate examinations rule out other possible disorders that could be causing the symptoms. Once other possible causes have been ruled out and a pattern has been established, the agency will consider the foregoing findings reported by a physician to be 'signs' that establish the existence of a primary headache disorder as a medically determinable impairment. In this case, the record does not establish the appropriate clinical signs to warrant a diagnosis of a primary headache disorder; thus, this is not a medically determinable impairment.

(R. 22). After that description, the ALJ detailed that Plaintiff "underwent extensive workup for these subjective allegations by numerous doctors and specialists. However, all off her workup was negative; her brain MRI, brain MRA, EEG, ambulatory EEG, and vestibular exam were all normal." (R. 22). The ALJ also noted that medication improved her symptoms and that a doctor described her dizziness as "subjective." (R. 22-23). The ALJ correctly noted that the medical findings were all normal but treated this as evidence that there was *not* a primary headache disorder, despite the guideline directives. *See* SSR 12-4P.

His misconception of the meaning of her normal test results was exacerbated by his failure to address the other criteria that Plaintiff demonstrated. Just like the ALJ in *Amy O.*, the ALJ erred by failing to discuss the functional domains that require analysis pursuant to SSR 19-4P. Specifically, the ALJ failed to discuss: Plaintiff's need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, the frequency of Plaintiff's headaches, the fact that medications improved her symptoms, and a neurologist's note that her history is consistent with migraines. *See* SSR 19-4P. The ALJ's failure to address the relevant factors under SSR 19-4P undermine his ultimate conclusion that Plaintiff does not meet the listing criteria.

Moreover, the ALJ completely omitted any discussion of the objective medical evidence regarding Plaintiff's headaches from his RFC determination. (R. 26-30). The ALJ's failure to address the relevant SSR 19-4P factors and his failure to note the headaches in his RFC discussion demonstrates that he did not build a logical and accurate bridge between the evidence and his conclusions. *See Arnett*, 676 F.3d at 563; *Terry*, 580 F.3d at 475. Accordingly, the ALJ's determination that he would not include that impairment due to a lack of clinical support is also not supported by substantial evidence.

### c. Fibromyalgia

As for the fibromyalgia, SSR 12-2P instructs that a diagnosis of fibromyalgia, alone, is not sufficient to establish the disability. *See* SSR 12-2P. The Court must review the evidence to determine whether the criteria set forth in the 1990 ACR Criteria for Classification of Fibromyalgia or the 2010 ACR Preliminary Diagnostic Criteria is satisfied. *Id.* The latter requires: (1) a history of widespread pain in all quadrants of the

body and axial skeletal pain that has persisted for at least three months— though it may

fluctuate and may not always be present; (2) repeated manifestations of six or more

fibromyalgia symptoms and signs, like fatigue, cognitive or memory problems, waking

unrefreshed, depression, anxiety, or irritable bowel syndrome; and (3) evidence that other

disorders that could cause these repeated manifestations of symptoms, signs, or co-

occurring conditions were excluded-- for example, complete blood counts, erythrocyte

sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor. *Id*.

Courts have recognized that, in most cases, there will be no objective medical

evidence indicating the presence or severity of fibromyalgia. *Criner v. Barnhart*, 208 F.

Supp. 2d 937 (N.D. Ill. 2002); *See also Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir.

2017). However, an ALJ may consider the lack of objective evidence in conjunction with

other factors, such as the claimant's activity levels and the treatment she received to

alleviate the pain or other symptoms. 20 C.F.R. § 404.1529(c)(2)-(4); *Simila v. Astrue*, 573

F.3d 503, 519 (7th Cir. 2009).

The Social Security Administration recognizes the complexity of fibromyalgia and

the importance of subjective evidence in assessing a claimant's ability to work. *See* SSR

12-2P. Thus, an ALJ may not discount a claimant's testimony solely because it is not

substantiated by objective medical evidence. 20 C.F.R. § 404.1529(c)(2); SSR 16-3p; *Adaire

v. Colvin*, 778 F.3d 685, 687 (7th Cir. 2015). "For example, when objective medical evidence

conflicts with a claimant's description of the intensity or persistence of pain, an ALJ must

consider all evidence in the record— such as the claimant's daily activities, medications,

course of treatment, and statements by other people about the claimant's symptoms—

before determining the credibility of a claimant's self-reported pain." *Hohman v. Kijakazi*, --- 4.th ---, 2023 WL 4230205 (7th Cir. 2023). The Seventh Circuit has also made it expressly clear that "[a]n ALJ may not discount a claimant's credibility just because her claims of pain are unsupported by significant physical and diagnostic examination results." *Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) (internal citations omitted); *see Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017).

On September 12, 2018, Plaintiff's rheumatology specialist opined that Plaintiff's "symptoms seem likely consistent with fibromyalgia." (R. 823). The specialist made the following observations: tenderness in Plaintiff's hips and lower back, the right second and fourth flexor tendons and palm, the left fourth flexor tendon, widespread soft tissue and joint tenderness, and decreased lumbar flexion. (R. 829). The specialist provided a graphic highlighting swelling, tenderness, and pain throughout Plaintiff's entire body. (R. 829). She thought Plaintiff should see a neuromuscular specialist to rule out other conditions which Plaintiff did on November 27, 2018. (R. 694). Contrary to the Defendant's assertion, the widespread pain was noted on more than one occasion. (*See* R. 835, 841). However, in 2019 the specialist noted that "[a]ll of her symptoms are from the low back down, so it is hard to say that she has fibromyalgia." (R. 1321). The specialist prescribed hydroxyzine for chronic pain and advised that Plaintiff will likely need to continue physical therapy exercises for life to reduce her pain. (R. 1321). The specialist also ordered several blood tests. (R. 841-47). At the hearing, the specialist's finding was further supported by Plaintiff's report that her pain was nonstop. (R. 61).

The ALJ's analysis focused on the lack of a definitive diagnosis by a licensed physician and noted that the rheumatologist found that she "likely did not have fibromyalgia." (R. 23). To be clear, however, the specialist only said that "it is hard to say that she has fibromyalgia," not that it is unlikely. (R. 1321). That is significant as "fibromyalgia pain waxes and wanes," over time. *Hohman*, --- 4.th ---, 2023 WL 4230205. As part of his analysis, the ALJ also misstated the record, as Plaintiff did see a neuromuscular specialist in 2018. (R. 694). There was no mention of the other medical evidence supporting the likely diagnosis of fibromyalgia—even though the medical evidence includes many reports of widespread pain; symptoms, signs and contemporaneous conditions associated with fibromyalgia; and numerous tests and treatment protocols that plaintiff's doctors conducted while looking for explanations, such as MRIs, blood work, and neuropsychological referrals. (R. 61, 694, 829, 1321). Finally, the ALJ did not consider other relevant factors, such as the claimant's activity levels and the treatment she received to alleviate the pain or other symptoms. 20 C.F.R. § 404.1529(c)(2)-(4); *Simila*, 573 F.3d at 519.

Based on the foregoing, the Court finds the ALJ failed to discuss the relevant evidence in conjunction with Plaintiff's fibromyalgia claim, including her associated symptoms. *Thomas v. Colvin*, 826 F.3d 953, 959 (7th Cir. 2016) (remanding case where ALJ failed to adequately address plaintiff's fibromyalgia, and stating that, "without any analysis from the ALJ, there is no basis for drawing any conclusions about what evidence [of fibromyalgia] he considered or overlooked").

### d. Harmless Error

The Commissioner argues that, even if the ALJ was wrong to omit any of these impairments at step two, the error was harmless because the ALJ considered all of the objective evidence of functional limitations in concluding that Plaintiff could perform a reduced range of light work. This argument is unpersuasive, however, because the ALJ's RFC assessment is based, in part, on his failure to acknowledge the limitations caused by Plaintiff's subjective reports of pain as they were not supported by objective medical evidence. (R. 27); *See Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017) (finding that fibromyalgia cannot be measured with objective tests).

In *Arnett*, the Seventh Circuit held that the omissions of several impairments at step two and five could not be considered harmless because the RFC determination made no mention of the impairments. *Arnett*, 676 F.3d at 593. The court noted that the error may have been harmless if it was considered in the RFC, but because they were not, the RFC was not "sufficiently specific" as to that plaintiff's limitations. *Id.*

Here, just as in *Arnett*, the ALJ's omissions cannot be considered harmless because the RFC did not take into account the limitations of all of Plaintiff's impairments. (R. 26-30). It cannot be said that the omission of these impairments at steps two and five were harmless. Because the omission of these impairments impacted his overall RFC decision, the ALJ's error was not harmless.

### 4. Borderline Age Rule

Finally, Plaintiff argues that the ALJ's failure to apply the borderline age rule could have resulted in a different outcome "if adequate vocational evidence had been collected." (Doc. 15 at 20-22).

A claimant under the age of 50 years old is considered a "younger person" whose age will not seriously affect his or her ability to adjust to other work. 20 C.F.R. § 404.1563(c). However, in some circumstances, the Social Security Administration considers "persons age 45–49 are more limited in their ability to adjust to other work than persons who have not attained age 45." 20 C.F.R. § 404.1563(d) (quotations omitted). An ALJ must consider the different age categories when determining a claimant's ability to work. 20 C.F.R. § 404.1563(b). In the event of a borderline age situation—meaning a situation in which a claimant is close to a different age category—the categories should not be applied mechanically. *Id*. Section 404.1563(b) indicates a "two-part analysis in determining whether a borderline situation exists: (1) whether the claimant's age is within a few days or months of a higher age category; and (2) whether using the higher age category would result in a finding of disability." *Pelech*, 2016 WL 727208, at *6 (quotations omitted). The borderline age rule applies "whenever the age category changes within a few months after the alleged onset date, the date last insured (or the prescribed period), or the date of the ALJ's decision." *Figueroa v. Astrue*, 848 F. Supp. 2d 894, 901-02 (N.D. Ill. 2012).

The Seventh Circuit has not expressly addressed whether the ALJ must "explicitly show" that he has considered the borderline age rule. However, district courts in Illinois

have held that the absence of a statement by the ALJ showing that he "considered which category was the appropriate one in which to place the plaintiff ... alone requires remand," as such an absence makes it "impossible for there to be meaningful review of the age category determination." *Figueroa*, 848 F. Supp. 2d at 899-900*; see also Malgorzata K v. Kijakazi*, 2022 WL 2257122, at *3 (N.D. Ill. June 23, 2022); *Moody v. Berryhill*, 245 F. Supp. 3d 1028, 1034-35 (C.D. Ill. Mar. 28, 2017); *Cisero v. Colvin*, 2016 WL 3568082, at *3 (N.D. Ill. June 24, 2016); Pelech, 2016 WL 727208, at *7.

For example, in *Pelech*, the claimant was about four months away from his 50th birthday on the date the ALJ issued his decision. *Pelech*, 2016 WL 727208, at *7–8. There, the ALJ noted the claimant's date of birth and his age on his date last insured. *Id*. Consequently, the district court found that remand was necessary because the ALJ did not state whether he considered the borderline age situation at all, and because the claimant's sedentary RFC would have dictated a finding of disabled if the ALJ had considered the next age category. *Id*.  The court emphasized: "We have no idea whether the ALJ considered Mr. Pelech's approaching 50th birthday as a borderline age situation, or whether he simply looked at Mr. Pelech's chronological age and applied the 'younger individual' age group in a mechanical fashion and without further thought." *Id*.

In this case, the ALJ stated, "[Plaintiff] was born on April 29, 1971 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date." (R. 31). The ALJ also acknowledged earlier that Plaintiff was 49 years old at the time of his decision. (R. 27).

More specifically, on the date the Decision was issued, Plaintiff was about five months shy of being 50 years old. (*See* R. 33). Although § 404.1563(b) does not define precisely how many months a "few months" is, the Court is satisfied that because Plaintiff was within a "few months" of the next age category on the date of the ALJ's decision. *See Jaimes v. Kijakazi*, 2022 WL 504078, at *3 (E.D. Wis. Feb. 18, 2022) ("A 'few days to a few months' generally means a period not to exceed six months."); *Young v. Barnhart*, 287 F.Supp.2d 905, 913 (N.D. Ill. 2003) (remanding a borderline age claimant who was four and one-half months away from the next age category); *Graham v. Massanari*, 2001 WL 527326, at *3 (N.D. Ill. May 9, 2001) (remanding a borderline age situation where the Plaintiff was four and one-half months away from turning fifty).

Defendant argues that the ALJ properly rejected the borderline age rule. (Doc. 18-1 at 18). Defendant does not cite to any portion of the ALJ's decision that discusses and rejects the borderline age rule, nor can this Court find such a portion. Instead, just as in *Pelech*, the ALJ did not state whether he considered the borderline age rule or what factors were used in determining whether it applies. (R. 31-32). Because the ALJ made no mention of the borderline age rule, it is "impossible for there to be meaningful review of the age category determination." *Figueroa*, 848 F. Supp. 2d at 899-900. Therefore, just as in *Pelech*, remand is appropriate so that the ALJ may analyze the borderline age issue and explain what evidence was considered in making the age category decision.

III.     **CONCLUSION**

IT IS ORDERED that the decision denying benefits to Plaintiff Kathleen Cox is REVERSED, and this case is REMANDED to Defendant Kilolo Kijakazi, Acting Commissioner of Social Security, for further proceedings consistent with this opinion. Additionally, Plaintiff's request for a different administrative law judge to preside over any remand hearing is GRANTED without objection.

ENTER: September 11, 2023

COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE